Case number 18-1222, United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industry, and Service Workers International Union, AFL-CIO, CLC Local 14300-12 Petitioner v. National Labor Relations Board. Mr. Sharma for the petitioner, Ms. Sheehy for the respondent, and Mr. Peterson for the interviewee. Mr. Sharma, good morning. Good morning. My name is Manish Sharma. I represent the petitioner in this matter at United Steel Workers. I'm honored to be here, and I appreciate the opportunity to discuss this matter with you. I've reserved three minutes for rebuttal time. In this case, the union challenges the board's finding that the company met its rebuttal burden under the second step of its right-line analysis. The union acknowledges that this means that it does have a high hill to climb in order to prevail, but we believe that we can make that climb. The board's two-step right-line analysis probes the causal relationship between an employer's action and its employees' protected conduct, with the second step intended to allow the employer an opportunity to refute any causal connection. To prevail, the employer must show that its decision so sufficiently rested on non-discriminatory reasons that the contributing motivations applied by any anti-union animus would not have changed the outcome of the decision. This is not an inquiry into the employer's true motivation or an attempt to weigh the illegal motivation against the lawful one to see which one is more compelling. As the board in right-line said, it does not matter if the unlawful motivation was the straw that broke the camel's back or the bullet between the eyes, as long as it had a determinative effect. It has to be a but-for cause. It's not enough that there was animus out there. For the employer to have committed the unlawful practice, it has to be a but-for cause, doesn't it? It has to be enough that if the removal of the consideration, the anti-union consideration, would have stopped the decision from occurring. That's a fact decision, right? Excuse me? That's a finding of fact. That is. And the standard of review is? Is substantial evidence. What is the standard of review? There's substantial deference to the board. It has to be substantial evidence in the record to support the board's finding of fact. And what part of that finding that the board made was not supported by fact in the record? What we find, the union argues that the ability for the board to have found that the company had sufficiently disentangled its unlawful motivation from the lawful motivation is not supported by fact. For the reasons that the ALJ found that the company embedded references to the unionized status of its workforce in upcoming collective bargain negotiations throughout its economic justifications for closing the Middlesboro facility and transferring its work to the non-union facilities. That in every piece of correspondence and in the initial capital expenditure request, the company links the presence of the union, limitations imposed by the union, and its desire to avoid bargaining with the union with the closure of the Middlesboro facility. So our argument is that on that record, the board could not have found that the lawful motivation, unlawful motivation or so could be disentangled to figure out whether or not the decision would have occurred anyway. I want to say I'm brief. Do you dispute the decision to close was made in September of 2014? We don't dispute that that was likely when the decision was made. We do argue that evidence of statements made beyond that are relevant to what the company was thinking as of September 2014. And so I was trying to understand in part what role or what is, how are we supposed to do with all the secrecy about not disclosing the move to the Clinton facility, not telling the union or employees about the fact that there would be a facility there that they could apply to not facilitating their transfers to the Clinton facility. Is that post hoc evidence that sort of looks back and in your view shines a light on what was driving the decision or is there a distinct problem in how they handle disclosing this to the union and not facilitating employees? No, Your Honor. In our case, we are arguing that that is evidence that helps shine a light on the company's thinking in closing the Middlesbrough facility, that at least part of the motivation, as even the board concedes at the first step of Brightline, was a motivation to rid itself of the union. And that secrecy is consistent with that, that they didn't want, they wanted to open a new facility at which there would be a non-union workforce, a workforce that would not likely have a contract that had restrictions on 24-7 operation, filed grievances, those type of things that the evidence in the record suggests that they did not like. And I know that there's evidence in the record about two Middlesbrough employees who were, with some signing confidentiality agreements, were moved to the Clinton facility. What I wasn't clear from the record is whether any other Clinton employee, Middlesbrough employees or at least union members, got jobs at the Clinton facility. Do we know or is the record just unclear? I think the record is unclear on that. And to be honest, Your Honor, I do not know the answer outside the record. Okay. So the board in its brief provides three justifications to support its reasoning as to why the board believes that the company met its rebuttal burden. So the company rested its decision on its need for a modern facility, its desire to increase profits and efficiency, and the board's skepticism that the company would have made a $20 million investment to relieve itself of low-level union activity. On the last one, the board's own skepticism, or the idea that it is implausible that the company would have made the $20 million investment to rid itself of the union, that's a misplaced analysis of the second step of right line, that the board has already determined that it was motivated, at least in part, by its desire to rid itself of the union. So to now say, well, that would be implausible, is misplaced here at the second step. As far as if you're simply trying to ask us to reweigh the evidence when you say that, counsel. The board felt that implausible. Who are we to say the board is wrong? We're supposed to defer to their analysis of facts. I believe, Your Honor, if they had said that as an initial matter, as the first step of right line, and I made the argument here, then I would be asking you to reweigh the evidence. I'm not sure I see the inconsistency. Well, the board, even in the brief, they concede that part of the motivation for the company's decision to close the facility was its union. How is that inconsistent with the labor thing? That would not have been enough to cause those midgets to move. I don't see the inconsistency. Because they're not necessarily saying – It sounds like you're just asking us to assign a different weight to the two aspects of the two. I respectfully believe that I'm not. I'm saying that the board went beyond saying that that simply wasn't a sufficient reason. They said it was just simply implausible that the company would do such a thing, making it sound as though that couldn't have been a motivation at all, which they had already determined in the first step it was a motivation. So the problem, the way they said it, was that they weren't then factoring in whether it was, as you said, the straw that broke the camel's back. They seem to say this wouldn't drive the decision by itself. But the inquiry is whether they may have had these other business reasons and whether the absence of a union is what put the decision over the top or not. That's correct, Your Honor. And the line doesn't grapple with that. That's correct. Because the union's not arguing that this is a pretextual case. We acknowledge that the company had mixed motives. It had some economic justification for what it did. But whether or not the added motivation that the board determined at the first step was there was enough to sort of put it over the finish line to get to that decision that it made. So are you making a legal argument that they didn't analyze it by applying that test, or are you making an evidentiary argument that there's something in this record that wouldn't allow them to – they didn't have substantial evidence for determining that, even without the union issue, they would have made this decision. I'm trying to figure out which it is. I thought it was more the second, the substantial evidence argument. It is, Your Honor. Because they did offer two justifications that the company wanted a modernized facility in that they desired to increase profits in efficiency. So what can you best point to in the record to support your theory that it was the anti-union motivation that put the decision over the top, or that the decision wouldn't have been made, but for that icing on the cake? Well, in its presentation in September of 2014, it points out that the – initially, talking about the background of the plant, it mentions that it's a unionized workforce since 1987, and it precedes that statement with a critical statement about the plant, and follows that statement with a critical statement about the plant. The preceding statement is that the current building cannot expand likewise. The following statement is that it's a critical facility in development of new products without dedicated R&D and testing equipment. So there it's presenting as background it's a unionized facility in a list of factors that were sort of explaining why the plant needed to go away. And that's further supported by – there's another slide in the presentation entitled Current Limitations, in which it listed can't run all lines 24-7 union contract limitations. And it says no contract limitations to run 24-7 all time as a benefit to having a new facility and what the hourly staff requirements would be. There's also an email that came out later by Lisa – that was edited by Lisa Jenkins, who's the project engineer manager, and she edited the email to include the reasons for closing the Middlesboro facility. The constructed facility's equipment is outdated and in need of replacement, and the facility is the only union represented workforce out of the 10 Durline manufacturing locations. And she testified that she made that edit based on information she had learned while being there. So I think that those are examples of the type of evidence that's in the record that makes it difficult – or it makes it impossible for the board to have disentangled the lawful motivation from the unlawful motivation to say sufficiently that the lawful motivation would have solely driven the decision. All right. We'll give you a couple minutes to reply. Thank you. Ms. Sheehy? Barbara Sheehy for the National Labor Relations Board. I don't have much to add beyond what's in the brief, but I'll touch on a couple of things that came up in opposing counsel's argument. We'll start where Judge Santel asked specifically what the test is, and it's absolutely right that it's a but-for test once you've gotten past the initial general counsel's burden to show that unlawful motivation is present. And then it moves to the second stage to show that the – it's up to the employer at that point to demonstrate that it would have taken the same action in the absence of union activity. And again, I think the questions with opposing counsel in the court have shed a lot of light on the fact that this really does boil down to a difference of opinion on how the board chose to view the facts in this case. And if that's what it comes down to, the law is clear that the board is entitled to deference on those issues. So picking up a little bit on the facts there, my opposing counsel closed with a couple of comments about the evidence that's in the record. I think if you focus on the intervener's brief, I think they've done a very nice job in highlighting some of the problems with relying on that evidence, looking at it the way that the board looked at it, for instance, where it was appearing in the slide presentation, the bullet point pertaining to the union being – having a 24-7 restriction in the contract. That was among the bullet point list of six or seven when it was presented again later, and that was in the – I'm sorry, the cover letter for the second capital expenditure. And then in the PowerPoint presentation, it's one time in the limitations section. It's one of 22 bulleted items for – excuse me, for limitations. In the remedy part of that PowerPoint where they say this is what the new facility is going to fix, it's one of 29 bullet points. So I guess, I mean, as your friend pointed out, there was an upfront finding here that, for shorthand purposes, I would call anti-union animus. Sure. Anti-union animus was a motivating factor in this – or a factor in this decision-making. It was present. So it was something that they were – it was part of their decision-making calculus. And so what the board was supposed to do was say, well, was it a tipping point? I mean, it could have been primarily causal, but you have a mixed record in this case. And so really it was, was this a tipping point? Would they have made the same decision if you backed that out? But the board's analysis is really, really short. And all it says is there's no dispute that they had these other reasons. That's true, there's not dispute. And then it applies this – it's implausible that they would have done this decision to relieve itself, essentially, from the union, which sounds like the union had to be solely causal. And that's not the right test. The right test is whether – I mean, it would obviously count if it were solely causal, but it doesn't – it could be a sort of 3% factor, but if it's what puts them over the top. And so where do you read in the board's decision that it's grappling with that influence, whether it was what put things over the top? That's what I don't see in the analysis. Right. It seems like they articulated the test wrongly in their implausibility line. Right. And so I think we – so that's one of the factors they looked at, right? So there were three different reasons that they credited the employer's affirmative defense. The first one was the modernized facility. And I don't think there's any dispute about what the limitations were physically on this plan and how the new facility corrected that. And then there was the second issue, the second factor that the board looked at, which was the profitability. And then third – Well, the profitability was all post hoc evidence, right? They said, hey, and look, it worked out. They made a lot of money. I don't see how that tells us anything. I thought there was also – and I may be misremembering the decision in order. I thought that there was something additional about in the capital expenditure request, both of them, there was a projected savings on the part of the company if the move was happening. So I thought the profitability comment had to do with that. I could be wrong, but that was my understanding. The profitability argument had to do with what was in as a projected savings for the employer. Okay, maybe I'm not reading it right because I had just read clearly there were limitations at this old place. And so these changes were critical to increasing productivity and efficiency. But that's right, the thing's crumbling under their feet. It's undisputed that as a result, things doubled and gross earnings went up. And I was just curious as to why – normally when we're looking at decisions, we look at information at the time of the decision. And I wasn't understanding why it mattered because I assumed your position would be the same, even if they say profits hadn't gone up for some reason. Certainly, I think the decision would have changed. Right, so why is that even relevant to be discussed? It's post-talk evidence. So I saw this, you know, it's crumbling, we can't expand. So in that sense, there's no profitability, it's just this thing is not working for us. Two, hey, they were right, they're making lots of money, which seems to me an irrelevant consideration. And three, the anti-union animus, no one would make this decision because – just because of a desire to get away from the union, which is the wrong legal text. Right, and I think what the Board is doing on that last part, though, is evaluating, looking at the strength of the employer's position, evaluating whether the employer was able to show that it would have taken this decision in the absence of. . . I'm not saying whether this record would have allowed the Board to do that. I'm just not sure. You know, maybe they should have had you write the decision. But we can't do that after the fact. I don't think this is a question about whether there's stuff there in the record. It's just did the Board make its finding, and really all we have is this implausibility. We have this, sure, it's undisputed there were huge problems. They couldn't expand, and they had hopes that expansion was going to make them more profitable. That goes hand-in-hand. Post-hoc evidence, and then this sole causation. Right, and I'm not sure I read it as a sole causation, what the Board did there, as opposed to. . . Well, it says in order to relieve. . . They wouldn't make this decision to relieve itself of union grievances or otherwise undermine the union. That doesn't grapple with. . . Sure, they wouldn't make a big decision like that solely based on union animus. But we all agree that's not the test. It's whether everything's going in one direction. But there were positives about the existing place and whether those put it over the top. Did the Board just do its homework? Did it show its work the way it should? Right, and I mean, we wouldn't. . . Explain to me how it showed the work in that. . . Right, and again, I guess I would fall back on the modernized facility. I think the Board does. . . I think they've evaluated that evidence very thoroughly in terms of what could and couldn't be done at this facility. And then. . . So I guess. . . I mean, I understand, and I don't mean. . . I'm not trying to be evasive. I understand what you're trying to say in terms of what that last statement is having to do with the implausibility of doing it. But I suppose the way that I read that in the Board decision was more evaluating the totality of what happened here, what the restrictions were, the very limited points in time where the union was mentioned during the communications, what the profit anticipation was, and that's all in the record. The Board understood that. And then in that context, saying on this record, on this information, we don't credit that the. . . We credit the employer's defense that it would have taken this action. That's not what they say, though. They say there's no reason. . . There's no way that a company would have made this big a decision just in order. . . I'm adding the just here. That's okay. In order to relieve itself of the union. Right. For grievances and other reasons. But to get away from. . . They wouldn't make this decision to get away from the union. That's a wrong test. That requires sort of a 51 percent union, anti-union motivation when, in fact, all they need is one, two, or three, if that one, two, or three is a tipping point. I don't see a tipping. . . When I keep saying. . . I don't see. . . I don't see the. . . It seems to me this was a case. It had to be a tipping point case. There was no way it was going to be a sole motivation case. Right. I don't see a tipping point analysis. I should have perhaps led when we started going down this line of questioning. I don't read the employer's opening. . . I'm sorry, the union's opening brief to make this argument. It certainly is in the reply because what I was. . . It's certainly in the reply, so I think we also would contest whether this is a sufficiently preserved and presented argument for the court. I don't read their opening brief to have it, which is why, when I was reviewing in our brief, why I didn't see a written response to the claim that the board's reasoning was faulted for having improperly inserted a first prong analysis into the second prong. So I should have perhaps started with that. That certainly doesn't cut off our conversation about this. But, again, I think you just have to fall back on the board decision order where they talk about. . . I mean, it's the modernized facility issue. It's the profitability. And then on the record as a whole, that this employer just did not. . . Irrespective of the union, this employer was not going to keep the Middlesbrough facility open. And I think there's testimony also as it relates to the 24-7 operation. I think there's testimony. It's either the CEO or the CFO who says that even if there wasn't a contract limitation, it wouldn't have changed the decision because that was only a minimum. . . That was only one of six or seven major issues that were wrong with this, and that couldn't have increased productivity enough to alter the decision. I think it was deemed minimal. So for these reasons, thank you. For these reasons, I'd ask that the petition be denied. Thank you. Mr. Peterson. Good morning. Grant Peterson representing the Intervenor Duraline Corporation. Basically, Your Honors, the test under right line is, as the Supreme Court indicated in the transportation management case, it's not one where the employer needs to rebut the first section of the anti-union animus. As we mentioned on page 12 of our brief, the Supreme Court specifically said that the board held that there were a substantial or motivating factor in the discharge was anti-union animus. Even if this was the case and the employer failed to rebut it, the employer could still avoid being held in violation if it shows that it would have taken the same action in the absence of union animus. And basically, we believe that the evidence, compelling evidence, shows that the company would have taken the same action. The union has conceded, basically, that the company's reasons and financial justifications were valid. There's no pretext here. The key is, would the company have closed the Middlesbrough plant even in the absence of union activity? And the answer is yes. And the reason being is that the physical limitations of the Middlesbrough plant prohibited the company from accomplishing its goals. There's more than that in the record. There's a lot about keeping this open of the Clinton facility secret from workers, doing absolutely nothing to facilitate their ability to get jobs at the Clinton plant. Do you know, other than the two who were sort of secretly moved to the Clinton plant, whether union members from Middlesbrough were hired at the Clinton plant? Yeah, there's no evidence in the record. There's also evidence of barriers to that, which is unusual. Often employers are trying to help their people move to the new location, so I'm trying to figure out how to factor in that. So it seems like it's not just the place was crumbling, but once we decided the open one, we did not want the union workers from here to go to Clinton. Well, I think the record evidence shows that the company expected the union to raise the issue of transfers during effects bargaining, and that, in fact, the company notified the union three times before the close of effects bargaining. One, when it announced the closing to the employees, and the union president was present at the time, and it was indicated that the manufacturing would be, in fact, transferred to Clinton. Again, during the public announcement in October, and again in response to the union's letter requesting decision bargaining, the company's lawyer indicated, well, the manufacturing would be, in fact, transferred from Middlesbrough to Clinton, and despite those notices, the union never raised the question of transfer. No, it's working with ALJ findings about, you know, all this stuff that was happening afterwards and the secrecy and the failure to do anything to facilitate employees. Well, you've got to drive yourself there and apply, and no evidence that, in fact, you hired any union people after, from the ALJ's view, this sort of strange behavior towards these union employees. And my only question is the board didn't grapple with that at all, doesn't deal with anything other than sort of the physical structure and the economic projections. And why isn't that important? It's not that it couldn't grapple with it, but why isn't that important evidence? If in a hypothetical case, not this one, you had strong evidence, you had the exact same record as to profitability and crumbling building, and it was clear that there would be no union employees at the Clinton plant, then surely the board would have to grapple with that, wouldn't it? Yes, except that, as you had mentioned, the decision was really made to close the plant in September of 2014, long before. Yes, but in deciding what motivated that decision, if afterwards it was that there's no way we're letting any union employees go there, that would be certainly relevant to understanding what motivated this in the first place. Just as you all want to say the profitability helps me, after the fact, understand what the motive was in September. Then surely preventing union members, and to be clear, I'm going beyond record here. I'm giving you almost like a hypothetical. If you had evidence of preventing union members from getting jobs at the new place, that should be factored in. Except that, a couple of things. One is the September 2014 documentation did, in fact, project a $7.3 million annual improvement in the profitability. So it's not after the fact evidence. That was part of the presentation. No, it's just the board talks about, and guess what happened? It worked. Right. I'm talking about the board's basis for decision. Sure, backing up that determination is in the record, and that there was projections made in September. The key is that the individuals that were involved in the effects bargaining, et cetera, were not the same people that were present at the September 2014 presentation. As a matter of fact, the park who was one of the key people in the effects bargaining piece wasn't hired until after September 2014. So basically, it all comes back to 2014, and it's clear that the company could not have accomplished its goals because of the physical limitations at the Middlesbrough plant, regardless of the union activity, or regardless of whether the workforce was unionized or not. I have a converse question. Is there any evidence that the company, in fact, did anything to prevent the employees from applying for the new location? No. I thought I saw something in the record about a discussion between the union and the company about where they would have to go to apply. Am I making that up? No. There was a job fair, and they were told to go to the job fair. They were told about it, and they could have gone and applied. Unfortunately, there's nothing in the record indicating that anybody actually did apply. It was like a 70-minute drive to get there, and you had the two employees who were transferred in secrecy. That's unusual, isn't it? Well, except that the reason for the confidentiality agreement was that the announcement hadn't been made to anybody, the public included, for the reasons stated that the company did not want to upset customers and employees to have them misinterpret what was going on, and so they wanted to make sure they could structure the announcement appropriately. As far as the drive to get there, if I remember my appellation geographically correctly, that's what, about an hour and 10-minute drive between Clinton and Middlesbrough? I believe that's true. Seventy minutes, yeah. Seventy minutes. That'd be an hour and 10 minutes. Yeah, exactly. All right. Thank you. Thank you. Does Mr. Sharma have any time left? Mr. Sharma does not have any time left. All right, why don't you take two minutes? Thank you, Your Honor. There's just a couple of points I wanted to make. One was on this issue of the profitability. As Judge Blunt points out, part of that is, okay, well, what happened afterward? But also the profitability comes about because there was a substantial investment that had to be made, and according to their calculations, due to the discounted rate of the money they were borrowing from Mexican, the parent company, it would take at least seven years to pay off just to build the Clinton facility. So, again, the question is, would they have made that investment solely based on the limitations with the plant, or with the added motivation of getting rid of the union, did that trigger that decision being made? And there's just simply not enough in the record to determine whether or not that's the case. The CEO testifying that it would have made a difference, I forget if it's the CEO or the CFO testifying that, had the union agreed to concessions with that and made a difference, and the testimony was no. But that's consistent with testimony, but that's consistent with the idea we just wanted to get rid of the union. That's not simply saying, well, if they had given us concessions, then we could have done what we wanted. If they had made a decision to get rid of the union, then, of course, the testimony would have been no. I think those are all the points I really wanted to make. All right, thank you. Thank you.
judges: Henderson, Millett, Sentelle